IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

      v.

DAJUAN MARTIN,

    Defendant.

23CR344
Judge John J. Tharp, Jr.

**DAJUAN MARTIN'S SENTENCING MEMORANDUM AND OBJECTIONS TO THE PRESENTENCE REPORT**

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................ i

TABLE OF AUTHORITIES ......................................................... iii

DEFENDANT'S SENTENCING MEMORANDUM ............................. 1

I.    OVERVIEW OF SENTENCING REQUEST AND GUIDELINE CALCULATION ................................................................ 1

II.    THE NATURE AND CIRCUMSTANCE OF THE OFFENSE JUSTIFY A SENTENCE OF 6 MONTHS ............................................. 1

III.    IN CONSIDERING THE §3553 (a) FACTORS, DAJUAN'S PERSONAL HISTORY, AND CHARACTERISTICS, A SENTENCE OF 6 MONTHS IS SUFFICIENT, BUT NOT GREATER THAN NECESSARY, TO MEET THE PURPOSES OF PUNISHMENT ........................................... 4

    A.  Congress mandates this Court consider Dajuan's personal history and characteristics which include the fact he was raised in a violent and turbulent home ........................................................ 4

        1.  Dajuan's stepfather was an alcoholic who physically and verbally abused his mother .................................... 7

        2.  Dajuan took on the role of family protector and *de facto parent* ......... 8

    B.  This Court should consider Dajuan's active church membership and community volunteer involvement when crafting the appropriate sentence ................................................................ 11

    C.  Dajuan's devotion to his wife and daughter should be considered by this court when crafting a sentence ..................................... 13

    D.  Dajuan has plans for the future .................................... 16

IV.    THE REQUESTED SENTENCE AFFORDS ADEQUATE DETERRENCE TO CRIMINAL CONDUCT, IS A JUST PUNISHMENT, PROMOTES RESPECT FOR THE LAW, AND PROTECTS THE PUBLIC FROM FURTHER CRIMES OF THE DEFENDANT ............................................. 18

V.    THE LOSS AMOUNT IN DAJUAN'S CASE DISPROPORTIONATELY DRIVES THE GUIDELINE CALCULATION ..................................... 19

**VI.    OBJECTION TO PRESENTENCE REPORT'S INCREASE TO BASE OFFENSE LEVEL UNDER U.S.S.G. § 3B1.3** ............................................................................................... 21

**VII.    CONCLUSION** ............................................................................................... 24

# TABLE OF AUTHORITIES

## CASES

*Gall v. United States* 552 U.S. 38 (2007) .................................................................. 1, 4

*Koon v. United States,* 518 U.S. 81 (1996) .................................................................. 4

*Pepper v. United States,* 562 U.S. 476 (2011) ............................................................ 4

*United States v. Adelson*, 441 F.Supp.2d 506 (S.D.N.Y. 2006) ................................ 19, 20

*United States v. Andrews*, 484 F.3d 476 (7th Cir. 2007) ............................................ 21

*United States v. Booker*, 543 U.S. 220 (2005) ............................................................ 1

*United States v. Cuff*, 999 F.2d 1396 (9th Cir. 1993) .................................................. 23

*United States v. Dikiara*, 50 F.Supp.3d 1029 (E.D. Wis. 2014) ................................ 19

*United States v. Emmenegger*, 329 F. Supp. 2d 416 (S.D.N.Y. 2004) ........................ 20

*United States v. Ferrin,* 994 F.2d 658 (9th Cir. 1993) ................................................ 23

*United States v. Fuchs*, 635 F.3d 929 (7th Cir. 2011) .................................................. 22, 23

*United States v. Louis*, 559 F.3d 1220 (11th Cir. 2009) .............................................. 21

*United States v. Milne*, 384 F.Supp.2d 1309 (E.D. Wis. 2005) .................................. 20

*United States v. Moose*, 893 F.3d 951 (7th Cir. 2018) ................................................ 20

*United States v. Pauley*, 511 F.3d 468 (4th Cir. 2007) ................................................ 16

*United States v. Posperi*, 686 F.3d 32 (1st Cir. 2012) ................................................ 20

*United States v. Schultz*, 743 Fed. Appx. 5 (7th Cir. 2018) ........................................ 21

*United States v. Thurston*, 544 F.3d 22 (1st Cir. 2008) .............................................. 13

*United States v. Warner*, 792 F.3d 847 (7th Cir. 2015) .............................................. 13, 19

*United States v. Whitehead*, 532 F.3d 991 (9th Cir. 2008) .......................................... 20

**STATUTES**

18 U.S.C § 3553(a) ........................................................................................ *passim*

U.S.S.G. § 3B1.3 .................................................................................... 21, 23

**OTHER AUTHORITIES**

Blake Griffin Edwards, *Alarming Effects of Children's Exposure to Domestic Violence,* Psychology Today (February 26, 2019) ....................................................... 8

Cindy Lamothe, *When Kids Have to Act Like Parents, It Affects Them For Life,* The Atlantic, (Oct. 25, 2017) ................................................................................... 10

*Peripherally inserted central catheter (PICC) line*, Mayo Clinic (June 6, 2023) .................... 13

Mark H. Allenbaugh, *"Drawn from Nowhere": A review of the U.S. Sentencing Commission's White-Collar Sentencing Guidelines and Loss Data*, 26 Fed. Sent. Rep. 19 (2013) .................. 20

<u>**DEFENDANT'S SENTENCING MEMORANDUM**</u>

Defendant, DAJUAN MARTIN by his attorneys, Bedi & Singer, LLP, respectfully requests, pursuant to 18 U.S.C § 3553(a) and *United States v. Booker*, 543 U.S. 220 (2005) and its progeny, that this Court impose a sentence of 6 months. In support of this request, Dajuan states as follows:

## I.    OVERVIEW OF SENTENCING REQUEST AND GUIDELINE CALCULATION

Dajuan comes before this Court as a 37-year-old married father of a two-year-old daughter, Dior Martin, whom he is raising with his wife, Tamera, and supports financially, emotionally, and lovingly. (PSR, ¶79). Dajuan respectfully requests, pursuant to 18 U.S.C. §3553(a) and *Gall v. United States* 552 U.S. 38 (2007), that this Court impose a sentence of 6 months. The proposed sentence is sufficient, but not greater than necessary, to comply with the purposes of sentencing. The sentence reflects the seriousness of the offense while considering Dajuan's family support, uncertain childhood, steady work history, desire to do better, and other statutory factors.

## II.   THE NATURE AND CIRCUMSTANCE OF THE OFFENSE JUSTIFY A SENTENCE OF 6 MONTHS

On July 8, 2024, Dajuan appeared before the Honorable John J. Tharp Jr. and pled guilty to Count One of the indictment. (PSR, ¶3). The charges state that between February 2022 and June 2022, Dajuan fraudulently issued airline vouchers to his co-defendant and co-conspirators in exchange for cash. (PSR, ¶1). These are extremely serious crimes, and the extent of the offense conduct has been accurately set forth in the PSR and the Government's version of the offense. Dajuan has pled guilty to this charge because he is, in fact, guilty. However, the charges in and of themselves do not tell the whole story.

The illicit activity that is the subject of these charges grew out of an appropriate and legal

1

relationship between Dajuan, a customer service agent for Southwest Airlines at Midway Airport, and Ned Brooks, a Southwest Airlines customer, and his co-defendant in these charges. (Ex. 1, PSR, ¶1). The two initially met when Brooks was introduced to Dajuan by a mutual friend. (Ex. 1). Brooks had been unable to secure a flight reservation for himself and his family to fly during a busy time of the year. (Ex. 1). This mutual friend suggested Brooks contact Dajuan for assistance with the requested Southwest Airlines flight. (Ex. 1). Brooks took this suggestion and contacted Dajuan for help. (Ex. 1). Dajuan was successful in reserving the desired tickets. (Ex. 1). Also, at this time, Dajuan had a discount voucher that Southwest Airlines had issued to Dajuan to use for himself, his family, or his friends. (Ex. 1). Because the voucher was expiring, Dajuan offered it to Brooks. (Ex. 1). Brooks accepted the discount voucher. (Ex. 1).

During the flight that Dajuan had arranged, Brooks evidently had an issue with Southwest Airlines. (Ex. 1). Dajuan does not recall the specifics of the issue since he had nothing to do with its resolution. (Ex. 1). A different customer service agent took care of it. (Ex. 1). However, Dajuan believes that this other customer service agent issued a money voucher to Brooks to compensate him for whatever inconvenience he suffered. (Ex. 1). Southwest Airlines used money vouchers[1] to deal with unhappy customers and incur their loyalty. (PSR, ¶10). Customer service agents were allowed to give these vouchers to disgruntled customers who had an unfavorable travel experience. (PSR, ¶10). Brooks accepted the SLV voucher issued by a different customer service agent. (Ex. 1).

At some point later, Brooks approached Dajuan to see whether Dajuan had access to these money vouchers. (Ex. 1). Dajuan said that he did have such access, and Brooks offered to buy them from Dajuan at a discount. (Ex. 1). From this contact, the illegal plan grew.

---

[1] These vouchers are referred to as SLVs ("Southwest Luv Vouchers") in charging documents.

Beginning in February 2022, Dajuan received text messages from Brooks and another individual requesting that Dajuan issue them vouchers, which he knew they were not entitled to have. (Dkt. 47 at 3). In response to these text messages, Dajuan created fraudulent vouchers, and Brooks and others paid Dajuan for them. (Dkt. 47 at 3). In June 2022, Dajuan ceased this illegal conduct. (PSR, ¶10). On June 5, 2023, Dajuan and Brooks were indicted for the instant offense. (PSR, ¶1).

Dajuan stopped his dealings with Brooks and others because his own life was moving forward, and he wanted to take a different path. (Ex. 1). On June 20, 2022, Dajuan's life inalterably changed when his daughter Dior was born. (Ex. 1). When the FBI interviewed Dajuan on June 24, 2022, he was cooperative with agents who came to his home. (PSR, ¶24).

Dajuan used the funds he received from these vouchers to care for his wife, who was in and out of the hospital due to complications from pregnancy, pay his bills, and pay for rent, food, diapers, and formula in anticipation of their daughter's birth. (Ex. 1). While the Presentence Report indicated Dajun "wasted" the funds, they offer no authority for this proposition other than referring to the 2021 Land Rover, which he purchased pre-owned in 2022. (PSR, ¶19). In a misguided effort to support himself, his wife, and their unborn daughter and to cope with his rapidly mounting debt, as will be discussed below, Dajun became involved in an imprudent money-making scheme that he now realizes was foolish and irresponsible. At the time, however, he saw no other way. He knows now he was wrong. There is always a way forward that does not require resorting to illegal activity. Dajuan is deeply ashamed and embarrassed by the facts and circumstances that bring him before this Court. (Ex. 1). The nature and circumstances of this case warrant a sentence of 6 months.

### III. IN CONSIDERING THE §3553 (a) FACTORS, DAJUAN'S PERSONAL HISTORY, AND CHARACTERISTICS, A SENTENCE OF 6 MONTHS IS SUFFICIENT, BUT NOT GREATER THAN NECESSARY, TO MEET THE PURPOSES OF PUNISHMENT

The United States Supreme Court has determined a defendant's history and characteristics are "clearly relevant to the selection of an appropriate sentence," and each sentence must "fit the offender and not merely the crime." *Pepper v. United States,* 562 U.S. 476, 488, 492 (2011). The sentencing court must "make an individualized assessment based on the facts presented." *Gall v. United States,* 552 U.S. 38, 50 (2007); *Koon v. United States,* 518 U.S. 81, 113 (1996) (The sentencing judge "consider[s] every convicted person an individual and every case as a unique study in the human failing that sometimes mitigate, sometimes magnify, the crime and punishment to ensue."). In considering all the §3553(a) factors, this Court will gain a fuller and clearer picture of Dajuan, showing a sentence of 6 months is appropriate.

### A. Congress mandates this Court consider Dajuan's personal history and characteristics which include the fact he was raised in a violent and turbulent home

Dajuan was born on December 10, 1986, in Chicago, Illinois, to the nonmarital union of Dwayne Bradley and Songa Martin. (PSR, ¶66). He was raised in the South Shore neighborhood on the South Side of Chicago. (Ex. 1). Dajuan has three younger maternal half-sisters, Robin, Ariana, and Andrea. (PSR, ¶69). While his sisters share the same father, they all consider themselves full siblings. (Ex. 1). Dajuan's mother and sisters have always been supportive of Dajuan. They continue to do so as he confronts the challenge of the instant charges. (PSR, ¶77).

Dajuan describes his childhood as "really toxic." (Ex. 1). Dajuan's biological father was rarely present during childhood; however, Dajuan did visit his father sporadically until he was around six. (PSR, ¶67). Dajuan returned home from one visit with his father and reported that he witnessed his paternal uncle, who lived with his father, engaging in some sort of sexual conduct

4

with his girlfriend. (PSR, ¶73). His mother was upset that his father had not monitored what was going on in his home. (PSR, ¶73). Dajuan's father did not believe this had, in fact, occurred. (PSR, ¶73).

Even worse, Dajuan was himself a victim in his father's home. (PSR, ¶72). Dajuan recalled that he was playing video games in his uncle's bedroom and woke up to his uncle touching his buttocks in his uncle's bed. (PSR, ¶72). Following two incidents of inappropriate behavior by the same paternal uncle, Dajuan's mother terminated Dajuan's visits with his father. (PSR, ¶72). The embarrassing and humiliating nature of these incidents was further compounded by his father's unfounded accusation that he was lying. (PSR, ¶72). Dajuan was about five or six years old, and his uncle was in his twenties. (PSR, ¶72). Dajuan related that he has only told four people about these incidents: his mother, his wife, the Probation officer of his PSR, and his attorneys. (Ex. 1). Dajuan says, "This was super-traumatic, so I buried it." (Ex. 1). Dajuan did not see his father again until he was 18. (PSR, ¶72). His father eventually apologized to Dajuan's mother when he realized Dajuan had been truthful. (PSR, ¶73). As Dajuan has gotten older, he and his father have reconnected. (Ex. 1). They talk monthly, and Dajuan says he and his father have a "pretty good" relationship. (Ex. 1).

Dajuan's mother married Andre Baker when Dajuan was four or five. (PSR. ¶66). The marriage to Andre Baker did not last. (PSR, ¶67). When Dajuan was in the fifth grade, his mother and stepfather separated. (PSR, ¶67). Their divorce was finalized in 2000. (PSR, ¶67). Though Dajuan's mother and stepfather are no longer married, his stepfather Andre Baker, writes, "I still consider Da'Juan as my stepson…I do not recall one time I was summoned to his school for any foolishness. It was smooth sailing. Once he was at the age to start working that is what he did. He is a respected young man throughout the church and with the young people. This

young man has been nothing but a joy in my life since the day I met him at approximately 2 years old." (Ex. 2).

Dajuan's mother was not around much once she and his stepfather separated, as she was working and going to college. (PSR, ¶77). During this time, the family had financial challenges. (PSR, ¶77). His mother related that the family was forced to live in subsidized housing, and there was often not enough food to eat. (PSR, ¶77). There was certainly not enough money for childcare, and she depended on Dujuan to care for his three younger sisters. (PSR, ¶77).

His mother explains, "I am a Head Teacher for Chicago Public Schools and a mother of four children who are all grown now. I raised my four children even through a divorce and decided to attend college after being out of high school for ten years. While I was afraid of the challenge of attending school, I wanted to be an example of perseverance and the importance of education for my children to look up to." (Ex. 3). As explained below, when he was a child himself, Dajuan was forced to assume the role of parent to his sisters and caregiver to his mother.

Once Dajuan's mother and stepfather separated, Dajuan craved a male role model and paternal figure. (PSR, ¶75). He believed he found such a person at his church to seek advice from and with whom to confide. (PSR, ¶75). In short, Dajuan treated this person as a mentor. (PSR, ¶75). Dajuan took this individual into his confidence and told him the secrets he did not feel comfortable telling his mother. (Ex. 1). Dajuan could reveal his thoughts about life, girls, and school. (PSR, ¶75). Dajuan says that he and this individual had what Dajuan refers to as "the sex talk." (Ex. 1). When, as a sophomore, Dajuan developed a crush on a girl in his class, he disclosed his feelings to this individual. (Ex. 1). This is a girl Dajuan calls his "first love," and they began dating. (Ex. 1). When this girl became pregnant, Dajuan was heartbroken, again revealing the situation to the man he had been confiding in. (Ex. 1). Dajuan and this girl had

6

never had sexual relations, so he realized that she had been seeing someone else, who was the father of her unborn child. (Ex. 1). All along, Dajuan believed his secrets were safe. (Ex. 1). However, upon divulging this last piece of information, Dajuan discovered this man had been gossiping to his mother all along. (Ex. 1). All his secrets had been violated and Dajuan felt betrayed. (Ex. 1). Dajuan walked into the door of his home, and his mother "went nuts." She began screaming at him, and said, "[t]hat baby is probably yours." (Ex. 1). Dajuan was heartbroken. First, because his mother knew all the intimacies of his life, and second, because his mother believed this young woman was pregnant as a result of his actions. (Ex. 1). This experience stayed with Dajuan into adulthood and continues to define him as a lack of trust in others. (Ex. 1). He and his wife are in therapy so that he can learn to overcome the impact of having his trust violated. (Ex. 1).

### 1. Dajuan's stepfather was an alcoholic who physically and verbally abused his mother

Dajuan's stepfather, Andre Baker, was an alcoholic and drug addict who physically and verbally abused his mother. (PSR, ¶67). Although Dajuan himself was not abused by his stepfather, he was nonetheless affected by the brutality he witnessed. Dajuan remembers a time when he was seven years old and his mother and stepfather began to argue particularly violently. (Ex. 1). His sister Robin was five, and Ariana was just a baby. (Ex. 1). Dajuan grabbed them both, and the three of them hid in a closet. (Ex. 1). He could hear "stuff being thrown around," "raised voices," and "tussling and things like that." (Ex. 1).

While Dajuan heard, rather than saw, most of the violence directed towards his mother, he does have a vivid recollection from another incident when he was about seven. (Ex. 1). Dajuan says, "I saw him push her real bad" and "I grabbed a hanger out of the closet" to defend her. (Ex. 1). His sister Ariana has similar memories when she writes, "I remember as kids as well

as growing up as adults watching my brother protect us and make sure all of his sisters and his
mother was [sic] okay." (Ex. 4).

There came a time when Dajuan and his sisters could anticipate his stepfather's erratic
behavior. (Ex. 1). His sister, Robin, would say, "He's drinking that juice again." (Ex. 1). When
that occurred, more often than not, violence would ensue. (Ex. 1). Dajuan was always on his
guard when he anticipated his stepfather would erupt in rage.

Despite not being the direct target of his stepfather's anger, Dajuan was no less a victim
of domestic abuse. "Even when they are not physically attacked, children witness 68% to 80% of
domestic assaults. These numbers are a sobering reminder of the toll a violent environment takes
on kids. The circumstances of DV [domestic violence] leave caregivers-emotionally and
otherwise-unavailable and unresponsive, and activate in kids a primal fear and a host of other
raw, complex, and unresolved emotions. …The psychological aftermath of exposure to DV can
include fear of harm or abandonment, excessive worry or sadness, guilt, inability to experience
empathy or guilt, habitual lying, low frustration tolerance, emotional distancing, poor judgment,
shame, and fear about the future."[2] Dajuan's mother corroborates Dajuan's memories. She related
that she separated from Dajuan's stepfather, and he moved out of the house in 1997, because he
drank excessively, used drugs, and physically abused her. (PSR, ¶67). The impact of this
violence in the household is something Dajuan still carries with him today.

## 2. Dajuan took on the role of family protector and *de facto parent*

Once Dajuan's mother and stepfather separated, Dajuan took on the role of family
protector and *de facto* parent. His mother was not around much. (Ex. 1). She was working at an
eye doctor's office and attending classes at Chicago State University to become a nurse. (Ex. 1).

---

[2] Blake Griffin Edwards, *Alarming Effects of Children's Exposure to Domestic Violence,* Psychology Today, (Feb.
26, 2019) https://www.psychologytoday.com/us/blog/progress-notes/201902/alarming-effects-childrens-exposure-
domestic-violence

At first, his mother would take Dajuan and his sisters to school with her. (Ex. 1). There was daycare at Chicago State, and sometimes, if they behaved, they could sit in on her classes. (Ex. 1). However, when Dajuan entered fifth grade, his mother decided he was "old enough" to stay home alone and take care of his sisters. (Ex. 1). His mother gave him his first key, which he proudly wore around his neck as he embraced his new responsibilities. Dajuan recalls that it fell to him to make sure his sisters were cared for. (Ex. 1). He walked his sisters to and from school, helped them with their homework, made sure they had clean clothes to wear, warm food to eat, and appropriate shoes for the weather. (Ex. 1). Mostly, he ensured they felt loved. (Ex. 1).

Dajuan's younger sister, Robin, remembers that when she and Dajuan were younger, they shared a room with bunk beds. (Ex. 5). Dajuan slept on the top bunk and Robin slept on the bottom. (Ex. 5). Robin writes, "I remember times when if I were sick or scared, he would sleep in the bottom bunk to bring me comfort. I remember one time, Da'Juan fell off the top bunk and injured his nose, he was scared to sleep alone for a while so I remember him sleeping in my bed with me for a little while." (Ex. 5).

Dajuan's youngest sister, Ariana, has her own recollections of growing up with Dajuan as her big brother. "A specific moment that stands out to me that I love about my brother is when it stormed one day. My biggest fear is a thunderstorm. Da'Juan and I were the only ones home and he had to leave to go somewhere. I was so frightened and saddened when he left because this would have left me alone. Moments later Da'Juan returned and said, 'Yeah, I knew you would be scared here alone so I came back.' That's the moment I knew that my brother was a superhero." (Ex. 4).

Dajuan's mother recalls that he not only cared for his sisters, but he also cared for her. While his mother was going to school, they were often stretched financially, and his mother has a

particular memory of trying to make ends meet. "I remember one day while in undergraduate school I cooked for my children and went into my room because I did not have enough to eat. I did not tell my children, but I got a knock on the door and it was Da'Juan. He was about 11 years old, and he had his plate and said, 'Mommy you can have my plate.' I told him I was ok, but I cried because of the fact that I did not say a word but he saw that it was not enough for me and he cared." (Ex. 3). His mother goes on to say, "[t]hroughout my journey to achieve my degree, Da'Juan was very supportive and always told me I could do it and how proud he was of me. He screamed so loud at my graduation and when I decided to go get my Masters he helped me with housework and kept his sisters entertained when I had to study." (Ex. 3).

Few other examples illustrate Dajuan's devotion and responsibility to his family as the following anecdote from his mother: "Da'Juan has always been caring to his sisters as well as myself. On his 18th birthday, he woke me up and asked me if I could write a notarized letter stating that if something happened to me, he would get the girls. He felt like other family members would not treat them well. That was so touching to me especially when he told me he had been anticipating turning 18 to ask me that question." (Ex. 3).

Even with the challenges he faced at home, Dajuan graduated from Kenwood Academy High School in Chicago, Illinois, in 2005. (PSR, ¶96). He attended Lewis University in Romeoville, Illinois, between 2005 and 2008, and studied psychology. (PSR, ¶97). He discontinued his college education to return home to help his mother financially so his half-sister, Robin, could attend the same university. (PSR, ¶97).

Children unwittingly thrust into the role of sibling caregiver has often been referred to as "destructive parentification."[3] Destructive parentification is defined as "a form of emotional

---

[3] Cindy Lamothe, *When Kids Have to Act Like Parents, It Affects Them For Life,* The Atlantic, (Oct. 25, 2017). https://www.theatlantic.com/family/archive/2017/10/when-kids-have-to-parent-their-siblings-it-affects-them-for-life/543975

abuse or neglect where a child becomes the caregiver of their parent or sibling. Researchers are…finding that in addition to upending a child's development, this role reversal can leave deep emotional scars into adulthood."[4] Many of these children experience "severe anxiety, depression, and psychological distress…Chronic unpredictable stress where there's no reliable adult."[5] Dajuan's experience helping to raise his siblings, and to look after his mother too, reflects the findings of this research. Dajuan's responsibility in childhood still affects him today and is another reason a sentence of 6 months is appropriate.

**B. This Court should consider Dajuan's active church membership and community volunteer involvement when crafting the appropriate sentence**

Dajuan is an active church member who serves his church, teaches music, and gives of his time, often as a volunteer. Jackie Jones, Jr. is the Senior Pastor of Rehab City Centre located in Houston, Texas. (Ex. 6). Before that, he was a longtime member of The Powerhouse Church in Chicago, where he met Dajuan. (Ex. 6). Pastor Jones writes, "Our bond developed when Dajuan joined the music ministry at The Powerhouse Chicago. At the time, I was choir director and assistant music department leader. Dajuan's musical passion was reignited when he joined the music department. Dajuan Martin previously sang with choirs and groups most of his life, as his family is very involved in music. I felt compelled within me as a leader to help cultivate and enhance his musical ability in teaching and directing the choir. It was during those times where I experienced Dajuan's evolution and growth musically and spiritually." (Ex. 6). Dajuan continued his devotion to this church, even during the pandemic when religious institutions were often struggling. Pastor Jones continues, "During the pandemic where churches were either closing or there was only a select group of people who could attend, Dajuan was faithful in his service to the Lord. He was singing on the praise team consecutively every Sunday for months. I find that

---

[4] *Id.*
[5] *Id.*

11

impressive being that his focus was still to impact, empower, and inspire others during one of the riskiest times in our world." (Ex. 6).

Zorriante Brown has known Dajuan as a mentor and big brother. (Ex. 7). His letter mirrors the sentiments of Pastor Jones. He writes, "I have witnessed Da'Juan serve in his local church, volunteer at other churches, and community-sponsored events by organizing and participating in musical showcases/productions on and off stage. He also participated in community service projects such as providing assistance to the elderly and selflessly giving of his time and donating to families. He has been among the first to set up for events and make sure things operate efficiently and make sure things are cleaned up at the end." (Ex. 7).

Dajuan's friend, Jakkia Small, has known Dajuan since they were children in their "church home." (Ex. 8). Jakkia says, "[w]e grew up in the Apostolic Church of God from attending church events, working summer jobs, and even attending events outside of the church with a group of mutual friends." (Ex. 8). Jakkia describes Dajuan as an individual to be relied on and writes, "[i]f anyone needed support, Dajuan was and is the person many people can count on to be there. He has always found a way to connect to the community and church by being involved in many groups, charities, supporting local politicians and community events and more. I can say from the moment I've met him, he has always been a giver, even if it was his last." (Ex. 8).

Dajuan has also been involved in the community through his own efforts as well. In 2020, Dajuan started Black Cultural Reserve, a non-profit organization that showcases Black-owned businesses via his website and a podcast. (PSR, ¶107). He has held multiple community service events, including a toy drive, a coat drive, and a turkey giveaway for families. (PSR, ¶107). He currently hosts a monthly event called "Man Let's Talk," which is a

12

roundtable discussion for men to openly discuss issues important to them. (PSR, ¶107). These events are extraordinarily significant to Dajuan and to those he serves.

In crafting appropriate sentences, judges have often looked to an individual's charitable and good works as a mitigating factor. *United States v. Thurston*, 544 F.3d 22, 26 (1st Cir. 2008) (sentencing defendant to 3 months incarceration in a case with a 5 million dollar loss when court took into account "charitable work, community service, generosity with time, and spiritual support and assistance to others"); *United States v. Warner*, 792 F.3d 847, 857 (7th Cir. 2015) ("A defendant's record of charity may justify a lenient sentence" and the charity need not be "exceptional" to warrant a departure below the guidelines). Dajuan's willingness to give of himself and his time to his church and community should be considered by this court when crafting an appropriate sentence.

### C. Dajuan's devotion to his wife and daughter should be considered by this court when crafting a sentence

Dajuan is a devoted husband and father whose family means the world to him. He and his wife, Tamera, have a two-year-old daughter named Dior. (PSR, ¶79). While pregnant, his wife was in and out of the hospital due to pregnancy complications. (Ex. 1). She was unable to work and they struggled financially. (Ex. 1). When his wife was home, Dajuan was the only one able to take care of his wife and act as her nurse. (Ex. 1). They could not afford private nursing care. (Ex. 1). Because his wife was seriously ill, could not keep food down, and was rapidly losing weight, she had a PICC line[6] inserted into her arm through which she received medication and liquid nutrition. (Ex. 1). Maintaining the PICC line and keeping his wife healthy was Dajuan's responsibility. Dajuan's mother recalls this time for the family. "When his wife was pregnant, she

---

[6] "A peripherally inserted central catheter (PICC) is a long thin tube that's inserted through a vein in [one's] arm and passed through to the larger veins near your heart … A PICC line requires careful care and monitoring for complications, including infection and blood clots." *Peripherally inserted central catheter (PICC) line*, Mayo Clinic (June 6, 2023) https://www.mayoclinic.org/tests-procedures/picc-line/about/pac-20468748

was very ill, and the condition was serious to the point that we were all worried about his wife and the baby. Da'Juan stayed by her side, and when she came home with meds that had to be intravenously administered, he did that without fail." (Ex. 3). Dior was born a healthy baby on June 20, 2024, and her mother recovered from the pregnancy complications.

Dajuan is actively involved in Dior's care, which includes picking her up from school and daycare, going to the park together, feeding and bathing her, and cooking her meals. (PSR, ¶77). His wife is a self-employed hairstylist and works most nights; thus, childcare responsibilities fall to Dajuan. (Ex. 1). It is a task which Dajuan happily accepts. (Ex. 1). Dajuan starts work at 5 am, and he picks her up from school at 4 pm. (Ex. 1). He says, "It's literally me and her until we go to bed for the night." (Ex. 1). Dior loves music, Disney movies, jumping up and down, and singing and dancing. (Ex. 1). Once a week, they have movie night, and Dajuan introduces her to a new movie. (Ex. 1). Though if it were up to Dior, she would watch "The Emoji Movie" every night. (Ex. 1). He is also teaching her new words and her ABCs. (Ex. 1). One of Dior's favorite things is to go to Burger King for "Whopper Wednesday." (Ex. 1).When Dajuan talks about his daughter, he says, with a smile in his voice, "[s]he's my homie." (Ex. 1).

His wife, Tamera, writes, "[h]e's such a caring individual that rarely tells people "no." When I decided to go to cosmetology school he immediately looked at the options we had and we discussed them. While being in school and building my brand, I wasn't able to help out financially concerning bills, etc. He made it work. My days consisted of 10+ hours and he worked and took care of our child needs the majority of her 1st year of life! He never complained. Dajuan is a generous individual. While being in his life consistently the last 6 years, he went without while helping others financially, where sometimes I had to fuss at him about being so giving (lol) [sic]." (Ex. 9).

14

Dajuan also has a seven-year-old son, Ethan. (PSR, ¶80). Ethan's mother has prohibited her son from seeing his father since she and Dajuan broke off their relationship. (PSR, ¶80). She has also blocked Dajuan's contact information and prohibits her son from even speaking to his father. (PSR, ¶80). While there is no court-ordered child support, Dajuan gets money, necessities, and gifts to his son through a cousin. (PSR, ¶80). Though Dajuan is saddened that he cannot have any contact with Ethan, he takes some solace in knowing that Ethan is provided for.

Dajuan's mother reflects on her son's role as a father and husband. "He loves his family and has been that way since a small child and now that he is a father and husband, I see that same care. He takes care of the house and the baby by changing diapers, waking up through the night, cooking, making bottles, and any other way he can help. (Ex. 3).

Dajuan's friend, Armando S. John, reiterates Dajuan's mother's words. "Da'Juan is the father of two children, ages 6 and 1, one son, Ethan, and daughter Dior. Many words can describe him as a father. For me, devoted and caring stand out most. He is never too busy for his children, often, spending quality time with them after working long shifts. It's rare to see fathers like Da'juan who place such an emphasis on fatherhood. He loves his children. They are his motivation when he goes out into the world each day. He's said so many times. They will undoubtedly be devastated by his absence of justice fails." (Ex. 10). Dr. Sophia Jones-Redmond's letter mirrors these observations. She writes, "Da'Juan is a man of God with a gentle disposition. Since meeting Da'Juan he has always worked a job. I was at his mom's birthday party last year and the host had a taco truck. This was my first-time meeting Da'Juan's baby girl. He was feeding her and held her the entire time except for the time Da'Juan walked one of the Elders of the church to her car. He got up and took the Elder's hand and it was such a sweet moment and there were no words exchanged…grandmom did get a few minutes to hold

Baby Dior. Every time I've been around Da'Juan he's always the same loving man attentively helping everyone. Da'Juan isn't a big talker…he's an observer and protector to all women he's around." (Ex. 11). Courts have taken an individual's role as an attentive and loving parent into account when crafting an appropriate sentence. *United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007) (role as a "good father" was "valid consideration" under 3553 factors). Dajuan's role as a father and husband is why the requested sentence is appropriate.

### D.  Dajuan has plans for the future

This case and the pressure of the unknown have undoubtedly caused Dajuan mental anguish. Dajuan feels "stressed" about this case, but he is otherwise "okay." (PSR, ¶89). Spending time with his daughter, Dior, listening to music, and teaching music to others helps him cope with the stress of this case. (PSR, ¶89). He says, "Once this case is behind me, mentally I'll be in a better place to focus." (Ex. 1). Dajuan wants to be able to focus on his future plans, his commitment to his community, and his family.

Dajuan has been consistently employed since the Summer of 2017, when he worked as a ramp supervisor for American Eagle Airlines. (PSR, ¶106). He left this job to start the interview process at Southwest Airlines. (PSR, ¶106). When he was between jobs, he worked as a rideshare driver for Uber and Lyft and a delivery driver for Amazon. (¶101, 104, 106). Since November 2023, Dajuan has worked as an account sales manager for Red Bull Distribution Company in Romeoville, Illinois. (PSR, ¶101). Dajuan gains a sense of pride and financial well-being from working and supporting his family. Dajuan knows that he can only be a productive member of society if he is gainfully employed. He wants to continue his employment in the future.

Dajuan is also a self-employed photographer. He says that taking pictures "has been the thing that's been keeping my mind together." (Ex. 1). A couple of times a month he takes

pictures at his church as a way "to make people feel good about themselves." (Ex. 1). Pastor
Jones refers to Dajuan as "super creative. He enjoys music but he's also great in photography.
DaJuan was exceptional in capturing moments in our worship services at the Powerhouse
Chicago that would tell a story every time. I have been a witness to this over the years as he
would take photos of me where I would be in the presence of God. I would use these photos to
describe my experiences via social media which has led to engaging comments and even
dialogue with my followers." (Ex. 6). Dajuan wants to continue his role in the Church.

      Dajuan has recommitted himself to his faith and will continue this commitment moving
forward. (Ex. 1). For a time, Dajuan feels he lost his way, but his plans for the future include a
renewed commitment to his church. (Ex. 1). Tonya Martin-Hicks, who has been a member of the
Martin family since 2017, speaks to Dajuan's devotion to "serving the lord." (Ex. 12). She recalls
how he "mime danced at a funeral. Everything had gone wrong that day for this family but the
one thing they held on to was his mime dance to the deceased person's favorite church song.
Everyone was up on their feet praising God while Da'Juan was ministering the song. It was an
amazing performance that had a lasting impression." (Ex. 12). She says Da'Juan is "a great
person and a man of God." (Ex. 12). His sister, Ariana, writes, "My brother is needed not only
for his family but for his community to help young black men and lead them to church. He's
needed for the young men to teach them how to dress and treat women as my brother has never
sagged his pants or caused harm to any woman." (Ex. 4). His return to the church, his active
participation within his community,  and his desire to lead by example once he is on the other
side of this case are some of his most significant future plans.

**IV.    THE REQUESTED SENTENCE AFFORDS ADEQUATE DETERRENCE TO CRIMINAL CONDUCT, IS A JUST PUNISHMENT, PROMOTES RESPECT FOR THE LAW, AND PROTECTS THE PUBLIC FROM FURTHER CRIMES OF THE DEFENDANT**

Dajuan's character, work ethic, dedication to his family, positive attitude, and goal of moving forward from these charges are his greatest deterrence. His wife, Tamera, writes, "Da'Juan is very beneficial in my life. He's my lifetime partner and father of my child. One of my biggest fears is having to do life without him. He plays a big role in my life as well as our child Dior. As stated before, he is my balance. Where I lack he steps in. He is a full time husband and father and shows us daily that he enjoys this job. Although it can be tiring, he never stops. He's the reason why I was able to fulfill my dreams being in this career. I truly cannot see continuous momentum without him physically by my side. I am fearful of explaining such a matter as this to our child. I never had to experience anything close to this. He's the love of my life and we need him. Little to no time is what we're praying and believing God for." (Ex. 9).

Dajuan promises, "[t]his won't happen again, because it won't happen in the life I will be living. My light will show this will not happen again. I fell astray. Where I am spiritually is different from where I was. God puts you in situations so you can get back to your faith." (Ex. 1). He says, "I am better for myself. Better for my daughter." (Ex. 1). Dajuan recalls what it was like to grow up without a father, and it rocks him to his core that for some period of time, he will lose contact with his daughter. Dajuan continues, "The scare of being away from my family and not being able to do what they need me to do makes me crazy." (Ex. 1). Dajuan considers his faith when he says, "It has changed me to know that I need to depend on God for everything. No one else. The biggest thing I've learned is where I need to put my hope and my faith in Him." (Ex. 1). Dajuan concludes by saying, "I am remorseful about this whole thing. If I could go back, I would not do it again. The strain this has put on my family means I would never do this again. I

deeply apologize." (Ex. 1). Dajuan's attitude shows deterrence, promotes respect for the law, and protects the public from further crime.

Courts have consistently held that deterrence is an important factor in white collar cases, as "[w]hite collar criminals seem like "prime candidates for general deterrence," because they (presumably) act rationally, calculating and comparing the risks and the rewards before deciding whether to engage in criminal activity." *United States v. Warner*, 792 F.3d 847, 860-61 (7th Cir. 2015) (internal citations omitted). When crafting appropriate sentences, courts have taken into account the Sentencing Commission's explanation that this specific deterrence can be accomplished by short but definite sentences for white-collar crimes. *United States v. Adelson*, 441 F.Supp.2d 506 (S.D.N.Y. 2006) (where court gave below guidelines sentencing and stated "there is a considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders."); *United States v. Dikiara*, 50 F.Supp.3d 1029, 1031 (E.D. Wis. 2014) ("The Commission endorsed at least a short period of imprisonment in [white collar] cases, concluding that the definite prospect of prison, even though the term may be short, would serve as a significant deterrent."). Dajuan's remorse, desire to do better, and support his family all reflect that specific and general deterrence can be accomplished with the requested sentence.

## V.     THE LOSS AMOUNT IN DAJUAN'S CASE DISPROPORTIONATELY DRIVES THE GUIDELINE CALCULATION

Dajuan's guideline range is driven heavily by the loss amount and his base offense level increased by 16 levels due to the alleged loss amount. This enormous base offense level increase does not reflect Dajuan's culpability, nor does it produce a just sentence based on the facts of the case. The guidelines place an inordinate importance on the loss amount to the detriment of the

factors this court must consider, nature and circumstances, culpability, Dajuan's personal history and characteristics, and the individual facts of this specific case. 18 U.S.C. § 3553(a).

Courts have found that determining the guidelines based largely on loss amount can lead to guideline ranges which would result in an unjust and disproportionate sentence. *United States v. Adelson*, 441 F.Supp.2d 506, 509 (S.D.N.Y. 2006) (stating the fraud guidelines place an "inordinate emphasis …on the amount of actual or intended financial loss" but do not "explain[]why it is appropriate to accord such huge weight to [this] factor[]"); *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427-28 (S.D.N.Y. 2004) (stating the guidelines place "undue weight on the amount of loss involved in the fraud" and concluding the loss amount "is a relatively weak indicator of the moral seriousness of the offense or the need for deterrence."); *United States v. Milne*, 384 F.Supp.2d 1309, 1312 (E.D. Wis. 2005) ("With their almost singular focus on loss amount, the guidelines sometimes are insufficiently sensitive to personal culpability"). These critiques have been reflected in practice, an analysis of sentences by judges has found "judges are more likely to disagree with Guideline recommendations in fraud cases that are driven substantially by loss."[7] As the Seventh Circuit has "made clear, district judges are as free to disagree with the policy behind the loss amount enhancement as they are with any other guideline." *United States v. Moose*, 893 F.3d 951, 959 (7th Cir. 2018).

In determining an appropriate sentence in fraud cases, courts have taken these critiques into account and sentenced individuals below the calculated guidelines range. *United States v. Whitehead*, 532 F.3d 991 (9th Cir. 2008) (defendant sold over $1 million worth of "counterfeit access cards" and guidelines were 41-51 months, received probation with community service and restitution); *United States v. Posperi*, 686 F.3d 32, 39, 41 (1st Cir. 2012) (the defendants were

---

[7] Mark H. Allenbaugh, *"Drawn from Nowhere": A review of the U.S. Sentencing Commission's White-Collar Sentencing Guidelines and Loss Data*, 26 Fed. Sent. Rep. 19, 26 (2013).

sentenced to probation after a $5.2 million loss, which the district court found did not accurately reflect the defendant's culpability and they had "no risk" of recidivism); *United States v. Schultz*, 743 Fed. Appx. 5, *9 (7th Cir. 2018) (imposing a sentence less than half of the advisory guidelines and reasoning " the loss amount resulted in an advisory guidelines range that overstated Schultz's culpability and thus required substantial discounting to arrive at a just and fair sentence.")

Increasing Dajuan's offense level by 16 based solely on the loss amount, does not adequately reflect the seriousness of the offense nor his culpability. If these 16 levels were not applied, or even if only 10 levels were applied, his guideline range would be years shorter. While the restitution and loss amount take into account the amount of loss to Southwest, Dajuan did not receive that same amount for himself. The loss amount overstates the amount of money Dajuan himself received as part of this activity, and thus the loss amount overstates his culpability, as he did not receive that amount in payment. This in itself reflects that the guidelines driven so greatly by loss amount do not give an individualized sentence which take into account the particularities of each case, nor the personal history and characteristics of the individual.

## VI.    OBJECTION TO PRESENTENCE REPORT'S INCREASE TO BASE OFFENSE LEVEL UNDER U.S.S.G. § 3B1.3

While not contemplated in the plea agreement, the probation department argues that Dajuan's base offense should be increased by two points under U.S.S.G. § 3B1.3, as he abused a position of trust. (PSR, ¶ 36). In order to determine if this enhancement applies, the court must analyze "1) whether the defendant occupied a position of trust; and 2) whether his abuse of the position of trust significantly facilitated the crime." *United States v. Andrews*, 484 F.3d 476, 479 (7th Cir. 2007). This is an "extremely fact sensitive" inquiry. *United States v. Louis*, 559 F.3d 1220, 1225 (11th Cir. 2009).

The probation department argues this enhancement applies as "the defendant had professional discretion to issue the DLVs to customers, as he did not need prior supervisory approval to issue the SLVs." (PSR, ¶ 36). Yet this alone does not reflect that Dajuan was in a position of trust, nor that his position facilitated the commission of the offense. This enhancement should not be applied.

First, Dajuan did not occupy a position of trust as contemplated by the guidelines for this enhancement. As courts have consistently stated, "There is an element of misplaced trust inherent in every fraud … and so what is required is a showing that the victim placed more than the ordinary degree of reliance on the defendant's integrity and honesty." *United States v. Fuchs*, 635 F.3d 929, 935 (7th Cir. 2011). Additionally, Application Note 1 to 3B1.3 explains that "This adjustment, for example, applies in the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination. This adjustment does not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk because such positions are not characterized by the above-described factors."

Dajuan's position as a customer service clerk at Southwest did not involve any more than the ordinary degree of trust that any employer places on their employee to do any job. Just because he did not need supervisory approval to issue SLVs does not mean this position gave him a position which entailed an extraordinary amount of trust. This was an entry-level position for which Dajuan's actions were monitored by his supervisors and the company, even if he didn't need prior approval for every action he took in his job. Dajuan is more similar to the bank teller or hotel clerk in the application note example than the attorney embezzling client funds or a bank executive.

Additionally, the facts of this case reflect that Dajuan did not have a special place of trust, as his actions were detectable and were immediately detected. His position at Southwest was not one that allowed him to conceal his conduct or to remain undetected, as the enhancement calls for. The government's version states that the conduct in this case began in approximately February 2022. (Gov. Version at 4). The government's version also states that in February 2022 "Southwest noticed a dramatic uptick in Martin's issuance of SLV's" (Gov. Version at 4). Southwest was immediately aware of Dajuan's conduct, reflecting that he was not in a position of trust as contemplated by this enhancement.

The Seventh Circuit has stated "We have explained that § 3B1.3 "encourages trust by making trust less risky to the trusting, and trust is an efficient substitute for continuous surveillance."... But this understanding of the guideline should not be confused with lax supervision or the victim's abdication of his own duties" *U.S. v. Fuchs*, 635 F.3d 929 (7th cir. 2011). Other circuits have echoed this understanding stating the "The critical inquiry is determining whether a person is in a position of trust is the extent to which the position provides the freedom to commit a difficult-to-detect wrong. There are two factors to be considered: the inability of the trustor objectively and expediently to determine the trustee's honesty, and the ease with which the trustee's activities can be observed. " *United States v. Ferrin,* 994 F.2d 658 (9th Cir. 1993) (internal quotations omitted); *United States v. Cuff*, 999 F.2d 1396 (9th Cir. 1993) ("If one party to employment relationship is able to take advantage of relationship to commit criminal act that will not be readily noticed, party occupies position of trust, subject to sentencing enhancement if position is abused, but if attempt to abuse employment relationship is readily noticed by other party, relationship is not one of trust.").

Dajuan was not in a position of trust because his actions were consistently monitored by

Southwest. Southwest knew he was issuing more SLVs than the average employee the moment he began the actions in the indictment. (Gov. Version at 4). This reflects that Dajuan was not in an undetectable position of trust with supervisory authority. The fact that Dajuan's conduct was flagged when he had more vouchers than others in the same position - shows that he did not use his position to conceal the offense, and therefore was not in a position of trust.

## VII.    CONCLUSION

Wherefore, based on the above arguments in mitigation, including Dajuan's personal history and characteristics, his care for his family, the nature and circumstances of the offense, the low chance of recidivism, and the need for a sentence to appropriately take into account all the statutory factors under § 3553, a sentence of 6 months is appropriate.

Respectfully submitted,

s/Jonathan S. Bedi
Jonathan S. Bedi
Dena M. Singer
Bedi & Singer, LLP
53 West Jackson Blvd., Suite 1101
Chicago, IL 60604
(312) 525 2017
dsinger@bedisinger.com
jbedi@bedisinger.com
**Attorneys for the Defense**

24

**Certificate of Service**

I, Jonathan S. Bedi, hereby certify, I caused a copy of the foregoing Motion to be served on upon the Assistant United States Attorney by causing it to be electronically filed with the Clerk of the Court using the CM/ECF system.

/s/ Jonathan S. Bedi
Jonathan S. Bedi